# Exhibit A

**CT Corporation**
**Service of Process Notification**
04/25/2024
CT Log Number 546281148

## Service of Process Transmittal Summary

**TO:** Melissa Faure
WARNER MEDIA, LLC
230 PARK AVE S FL 7
NEW YORK, NY 10003-1528

**RE:** Process Served in Tennessee

**FOR:** WarnerMedia Direct, LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | JONATHAN LALEWICZ vs. WARNERMEDIA DIRECT, LLC |
| **CASE #:** | 224CV813 |
| **PROCESS SERVED ON:** | C T Corporation System, Knoxville, TN |
| **DATE/METHOD OF SERVICE:** | By Traceable Mail on 04/25/2024 |
| **JURISDICTION SERVED:** | Tennessee |
| **ACTION ITEMS:** | CT will retain the current log |
| | Image SOP |
| | Email Notification,  Melissa Faure  melissa.faure@wbd.com |
| | Email Notification,  Kasia Biernacki  kasia.biernacki@wbd.com |
| | Email Notification,  LEAH MONTESANO  leah.montesano@wbd.com |
| | Email Notification,  Sara Stuckey  sara.stuckey@wbd.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System |
| | 300 Montvue RD |
| | Knoxville, TN 37919 |
| | 877-564-7529 |
| | MajorAccountTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

**CERTIFIED MAIL**

9589 0710 5270 0232 7460 25

Retail   37919

U.S. POSTAGE PAID
FCM LG ENV
TULLAHOMA, TN 37388
APR 23, 2024

**$10.16**

RDC 99    R2305K139967-5

LAW OFFICE
OF
GARTH SEGROVES
113 WEST MOORE STREET
TULLAHOMA, TENNESSEE 37388

CT CORPORATION SYSTEMS
300 MONTIVUE ROAD
KNOXVILLE TN 37919-5546

# LAW OFFICE OF GARTH SEGROVES
## 113 West Moore Street
## Tullahoma, Tennessee 37388
### Telephone: (931) 393-4366
### Facsimile: (931) 259-4466
### Email: garth_segroves@att.net

**Sent via U.S. Postal Service**
**Registered Return Receipt**

April 22, 2024

WarnerMedia Direct, LLC
c/o CT Corporation Systems
300 Montivue Road
Knoxville, Tennessee 37919-5546

     RE:    Jonathan Lalewicz vs. WarnerMedia Direct, LLC
                Coffee County General Sessions Court, Case Number 2024-CV-813

To Whom It May Concern:

     Please find enclosed the civil summons in the above captioned matter that CT Corporation Systems is listed at the registered agent for the defendant WarnerMedia Direct, LLC.

     Do not hesitate to contact me with any questions, or concerns.

                                      Sincerely yours,

                                      Garth R. Segroves

Enclosure:    Summons and Complaint

Page 1 of 1

| Coffee County | STATE OF TENNESSEE<br>CIVIL SUMMONS<br>page 1 of 1 | Case Number<br>2024-CV-813 |
|---|---|---|

**Jonathan Lalewicz**   Vs.   **WarnerMedia Direct, LLC**

Served On:

**CT Corporation Systems**   300 Montivue Road, Knoxville, Tennessee 37919-5546

You are hereby summoned to defend a civil action filed against you in General Sessions Court, Coffee County, Tennessee, 300 Hillsboro Blvd., Manchester, Tennessee, 37355. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: **4·5·2024**

_Jenny Anthony_
Clerk / Deputy Clerk

Court date **5·15·2024 9:00am**

Attorney for Plaintiff:   **GARTH R. SEGROVES – PHONE (931) 393-4366**
                          **113 WEST MOORE STREET, TULLAHOMA, TENNESSEE 37388**

**NOTICE OF PERSONAL PROPERTY EXEMPTION**

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County

**CERTIFICATION (IF APPLICABLE)**

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____    _____
                                Clerk / Deputy Clerk

**OFFICER'S RETURN**: Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____

Date: _____   By: _____
                                   Please Print: Officer, Title

_____           _____
Agency Address                   Signature

**RETURN ON SERVICE OF SUMMONS BY MAIL**: I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____     _____
                                Notary Public / Deputy Clerk (Comm. Expires _____)

_____           _____
Signature of Plaintiff           Plaintiff's Attorney (or Person Authorized to Serve Process)
                                (Attach return receipt on back)

ADA: If you need assistance or accommodations because of a disability, please call _Jenny Anthony_ ADA Coordinator, at **931-723-5110**.

CK 2938 145.50
Atty to Serve

Rev. 03/11

IN THE COURT OF GENERAL SESSIONS
COFFEE COUNTY, TENNESSEE

FILED
APR 04 2024
GENERAL SESSIONS COURT
COFFEE COUNTY TN
JENNY ANT... CLERK
TIME_____ AM/PM

| | |
|---|---|
| JONATHAN LALEWICZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 2024-CV-818 |
| | ) |
| WARNERMEDIA DIRECT, LLC, | ) |
| | ) |
| Defendant. | ) |

## GENERAL SESSIONS CIVIL COMPLAINT

HBO Max is an internet video streaming service.[1] HBO Max users watch prerecorded videos online through the HBO Max platform, including HBO original content and a library of popular movies and shows. HBO makes money by charging its users a monthly fee for access to that content on the platform. HBO Max is now one of the largest streaming platforms in the country, boasting over 90 million subscribers and an annual revenue of $2.45 billion.[2]

To maintain its strong position among dozens of competing video streaming platforms, HBO cannot and does not rely on word-of-mouth and basic television advertising alone. Rather, HBO must aggressively advertise where its customers are: Online. HBO pays a host of digital advertisers and analytics firms, most notably Meta Platforms, Inc.—the parent company of Facebook and Instagram—but also Google, Braze, and others to advertise HBO content.

---

[1] Home Box Office, Inc. ("Respondent" or "HBO") develops, owns, and operates HBO Max. HBO is owned by WarnerMedia.

HBO Max is currently the only streaming service offered by HBO. Formerly, HBO also offered HBO Now and HBO Go, in addition to HBO Max. For simplicity's sake, throughout the Demand Claimant refers to HBO's streaming service simply as "HBO Max" even though Claimant's allegations encompass all three of the streaming services that HBO offers or has offered in the past.

[2] Jennifer Maas, *Warner Bros. Discovery Tops 96 Million Streaming Subscribers Across HBO, HBO Max and Discovery+*, Variety (Feb. 23, 2023), https://variety.com/2023/tv/news/hbo-max-subscribers-discovery-plus-q4-2022-1235533690/.

A key component of HBO's digital marketing strategy—and the value proposition offered by Facebook and other digital advertisers to the companies that pay it for advertising—is using the individualized, personal data of HBO Max users to (i) target those users with content HBO knows they will like and (ii) target similar non-users with that same content, to draw them to HBO's offerings. To provide that data, HBO made the business decision to share its users' personal information with third-party companies, including a user's identity and the specific videos they watched on HBO Max. Before making this decision, HBO never asked for its users' informed written consent to share their specific video watching histories with third parties.

HBO's data sharing practices violate the federal Video Privacy Protection Act (the "VPPA")[3]. The VPPA prohibits HBO, "[a] video tape service provider," from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider" without that person's informed written consent.[4] HBO violated the statute when it disclosed the identity and specific HBO video watching history of Claimant without Claimant's consent. Claimant makes this Demand for Arbitration seeking relief for HBO's privacy violations, in accordance with the terms Claimant was required to accept as a condition of using HBO Max.

**To use HBO Max a user must subscribe**

HBO Max offers current and classic HBO shows, HBO Max originals, and shows and movies from others brands like CNN, DC, Looney Tunes, New Line Cinema, and Warner Bros.[5] Users can access HBO Max through a smart TV with the HBO Max app; through internet-

---

[3] 18 U.S.C. § 2710, *et seq.*

[4] 18 U.S.C. § 2710(b)(1).

[5] Ben Moore and Jordan Minor, *HBO Max Review*, PCMag (Jan. 13, 2023), https://www.pcmag.com/reviews/hbo-max.

connected devices like Roku, Amazon Fire Stick, and Apple TV; on a desktop browser through the HBO Max website; on a smartphone or tablet through the HBO Max app; or through other streaming platforms like Hulu and Amazon Prime Video. HBO allows up to 5 unique users per HBO Max account, each with their own HBO Max profile.[6]

Before accessing HBO Max video content, a user must either create an HBO Max account by providing HBO with their name, email address, and payment information or choose to sign in using credentials they have with a partner service—for instance, Amazon Prime Video, Hulu, Verizon, or DirecTV. Regardless of how they sign up, HBO Max users must pay for access to the platform.

Before streaming videos, all HBO Max users must agree to the HBO Max Terms of Use. The Terms of Use include an arbitration provision requiring that all disputes be brought in individual arbitration. Additionally, the HBO Max sign-up page contains a link to the HBO Max Privacy Policy, which lists several different legal obligations related to how HBO collects information from its users. But HBO does not have a separate and distinct consent form explaining that it will share with third parties a user's identity and the specific videos that user watched.

After signing up for an HBO Max account, a user can access the HBO Max platform and start streaming more than 13,000 hours' worth of HBO Max content.[7]

### HBO's digital marketing strategy

---

[6] HBO Max, *Add, manage, and switch profiles*, https://help.hbomax.com/us/Answer/Detail/000001240.

[7] Alison DeNisco Rayome and Kourtnee Jackson, *HBO Max Review: Expensive, but Its Catalog Is Packed*, CNet (Jan. 12, 2023), https://www.cnet.com/tech/services-and-software/hbo-max-review-expensive-but-its-catalog-is-packed/#:~:text=You%20can%20decide%20for%20yourself,Max%20is%20a%20great%20service.

To maintain its current user base and attract new users, HBO pays digital advertisers to send targeted ads to consumers. For this advertising HBO relies heavily on Facebook—through an advertising tool called the Meta Pixel—but it also advertises through and shares user data with other third-party companies.

A. The Meta Pixel

Chief among HBO's advertisers is Meta, the parent company of Facebook. Facebook is the world's largest social media platform. It refers to itself as a "real identity platform" and "bars users from having multiple accounts."[8] To that end, Facebook requires each Facebook user to provide their first and last name, mobile number or email, birthday, and gender when creating a Facebook profile.[9] Each Facebook profile also has a unique Facebook User ID number. Facebook can locate a specific Facebook profile and access that profile's personal information simply by querying the profile's User ID in its system.[10]

Meta makes money by selling advertising through Facebook.[11] Its customers are the companies that pay for its advertising. Meta's value proposition to those customers is it can accurately target consumers by building an "audience" of Facebook users who actually engage

---

[8] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, Wall. St. J. (Oct. 21, 2021), https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701.

[9] Facebook, *Sign Up*, https://www.facebook.com/signup.

[10] A Facebook User ID is so closely linked to a person's identity that anyone can find an individual's Facebook profile simply by appending that person's unique Facebook User ID (consisting of a string of numbers) to the end of a Facebook URL.

[11] In 2021, Apple announced new privacy policies protecting its users from invasive ad tracking technologies like those described herein. As a result, Meta forecasted that it would lose a staggering $10 billion in ad revenue. Daniel Newman, *Apple, Meta And The $10 Billion Impact Of Privacy Changes*, Forbes (Feb. 10, 2022), https://www.forbes.com/sites/danielnewman/2022/02/10/apple-meta-and-the-ten-billion-dollar-impact-of-privacy-changes/?sh=7eefcf0472ae.

with the product or service being advertised. This approach is commonly referred to as "surveillance advertising."[12]

Meta offers companies like HBO three different types of audiences for their advertisements: Core Audiences, Custom Audiences, and Lookalike Audiences. A Core Audience is a cohort of Facebook users grouped together and targeted based on their location, demographics, interests, and behavior.[13] A Custom Audience is a cohort of Facebook users who have "already shown interest in [the Facebook customer's] business,"[14] who are targeted with ads for exactly the product or service they viewed until they make a purchase—a process known as "retargeting."[15] For instance, an advertiser "can run a campaign to reach people who visited a product page but didn't complete a purchase to encourage them to go back to the website to do so."[16] A "Lookalike Audience" is a cohort of Facebook users who are similar to existing users of the product or service being advertised—they share the same demographics—and, in the case of a video streaming platform, can be targeted with the types of content users like them watch on the platform.[17]

---

[12] Facebook, *Ad Targeting: Help Your Ads Find the People Who Will Love Your Business*, https://www.facebook.com/business/ads/ad-targeting; *see also* Allison Grande, *Meta Hit with UK Suit Over 'Surveillance Advertising' System*, Law360 (Nov. 22, 2022), https://www.law360.com/articles/1552060/meta-hit-with-uk-suit-over-surveillance-advertising-system.

[13] Facebook, *Easier, More Effective Ways to Reach the Right People on Facebook*, https://www.facebook.com/business/news/Core-Audiences.

[14] Facebook, *Ad Targeting: Help Your Ads Find the People Who Will Love Your Business*, https://www.facebook.com/business/ads/ad-targeting.

[15] Jason Fishman, *What is Retargeting and Why is it Important?*, Forbes (May 20, 2021), https://www.forbes.com/sites/forbesagencycouncil/2020/05/20/what-is-retargeting-and-why-is-it-important/?sh=4915c0a57212.

[16] Facebook, *About Website Custom Audiences*, https://www.facebook.com/business/help/610516375684216?id=2469097953376494.

[17] Facebook, *Ad Targeting: Help Your Ads Find the People Who Will Love Your Business*, https://www.facebook.com/business/ads/ad-targeting.

So that Meta may build Custom and Lookalike Audiences, Meta's customers must gather and transmit to Meta vast amounts of personal information about their own users who are also Facebook users. Companies, including HBO, do this primarily using a piece of technology called the Meta Pixel.[18] The Meta Pixel is a snippet of computer code that Facebook advertising customers like HBO install on their websites to track visitor activity.[19] Meta calls this activity "events" on a website.[20] The Meta Pixel transmits information back to Meta when an individual who is a Facebook user interacts with the website on which the Pixel is installed, for instance by clicking on and watching a video.

Meta's customers choose to install the Meta Pixel on their websites and then choose the types of information the Pixel will transmit; none of these steps happen automatically. The Meta Pixel by default tracks common website "events" such as searching for a product, viewing a product, or purchasing a product, along with transmitting the URL of the specific webpage tracked.[21] Meta also allows advertisers to create custom Pixel code to gather information not covered by Pixel's default options, for instance transmitting the title of a video a Facebook user watches on the customer's website.[22] In all cases the Meta Pixel transmits back to Meta the Facebook User ID of the consumer whose activity is being monitored, via a field titled "c_user." Meta uses c_user—the Facebook User ID—to link a particular consumer's activity on a website to their Facebook profile, personal information, and demographics.

---

[18] Facebook, *About Website Custom Audiences*, https://www.facebook.com/business/help/610516375684216?id=2469097953376494.

[19] Ted Vrountas, *What is the Meta Pixel & What Does it Do?*, Instapage, https://instapage.com/blog/meta-pixel.

[20] Facebook, *Specifications for Meta Pixel Standard Events*, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[21] *Id.*

[22] *Id.*

Meta also offers other tools companies can use to bolster their advertising campaigns. For instance, a tool called "Conversions API" allows Meta to create "a direct connection between [a company's] marketing data and [Meta's] systems which help optimize ad targeting[.]"[23] In other words, through Conversions API a company sends a list of its users' identities and specific website activities with Meta, which then links that data with specific Facebook profiles. Another tool used by Facebook's customers is called Advanced Matching. That tool detects certain website text fields on a webpage—such as first name, last name, and email address—and associates these fields with corresponding events on the webpage—for instance the user's decision to click a particular video. The tool then passes that information back to Meta,[24] which matches the data to specific Facebook profiles. Again, this tool enables the type of targeting HBO and many other companies pay Meta for.[25]

Since at least 2016, HBO has paid Meta to advertise on Facebook. To enhance that advertising HBO installed the Meta Pixel on its streaming platform. HBO customized its Meta Pixel to transmit back to Meta—when an HBO Max user who is also a Facebook user watches a video on the platform—Pixel's default tracking information, the title of the video watched, and the user's Facebook User ID.

B. Other Advertising Tools

In addition to the Meta Pixel, HBO integrated third parties' software development kits ("SDKs") and application programming interfaces ("APIs") into the HBO Max app on mobile devices and Smart TVs. Through these tools HBO transmitted Claimant's identifiers and app

---

[23] Meta, *About Conversions API*, https://www.facebook.com/business/help/20411487026529657?id=818859032317965.

[24] Meta, *About Advanced Matching for Web*, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

[25] *Id.*

activity data to third-party marketing and analytics firms including, but not limited to, Google and Braze.

On information and belief, HBO also shared its users' identities and video histories through other advertising tools. These tools include Meta's Advanced Matching and Conversions API and pixel coding connected to other marketing and analytics providers like TikTok.

### Claimant's use of HBO

Claimant, Jonathan Lalewicz, made a subscription profile with HBO and streamed at least one prerecorded video on HBO. The e-mail address associated with Claimant's HBO subscription profile is jlalewicz5578@gmail.com. Claimant also has a Facebook account. Claimant remained logged into their Facebook account while they streamed videos on HBO.

Accordingly, when Claimant streamed an HBO Max video, HBO transmitted to Meta—through the Meta Pixel installed on the HBO Max platform—Claimant's Facebook User ID and the title of the video Claimant streamed. Claimant's Facebook User ID is unique to Claimant's personal Facebook profile, and therefore identifies Claimant personally. HBO knowingly installed the Meta Pixel on HBO Max and caused Claimant's personal information to be transmitted to Meta so it could better target its advertising.

On information and belief, HBO also knowingly transmitted Claimant's identity and video watching history to third parties through other mechanisms, including through third parties' APIs and SDKs integrated into the HBO Max app, Meta's Advanced Matching and Conversions API tools, pixel code linked to other third-party advertisers and analytics companies like TikTok, and by sending Claimant's identity and collecting video watching history directly to third parties.

Not long before filing, Claimant discovered that HBO may have sent their identity and the specific videos they watched on HBO Max to third parties. HBO never asked for Claimant's express written consent to transmit their video watching history to third parties and Claimant never provided that consent.

## When HBO transmitted Claimant's identity and video watching history HBO violated the VPPA

A. The VPPA

The VPPA "follows a long line of statutes passed by the Congress to extend privacy protection to records that contain information about individuals."[26] Congress passed the Act in 1988 after a weekly newspaper in Washington, D.C. published a story listing over a hundred video titles rented by Supreme Court nominee Robert Bork and his family at a local video rental store.[27] Judge Bork's rental history was hardly damning, but for Congress the disclosure raised broader concerns about unwarranted privacy invasions. The product of that concern, the Video Protection Privacy Act, prohibits a company from sharing a consumer's video watching history with a third party without consent.[28] Simply put, the VPPA was enacted to "preserve personal privacy" of a consumer's video history.[29]

In explaining the Act's importance, Senator Patrick Leahy, one of the Act's sponsors, noted that "in an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be

---

[26] S. Rep. No. 100-599, at 2.

[27] Michael Dolan, *The Bork Tapes*, Wash. City Paper (Sept. 25–Oct. 1, 1987), https://perma.cc/37V2-T2ZD.

[28] 18 U.S.C. § 2710(b). Congress amended the VPPA in 2012 by revising a provision allowing video tape service providers to disclose personal identifying information to third parties with informed, written consent. *See Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 53 (11th Cir. 2015) (citing 158 Cong. Rec. H6849–01 (Dec. 18, 2012)). The scope of the VPPA was not altered by the amendment. *Id.*

[29] *Ellis*, 803 F.3d at 1253 (quoting 134 Cong. Rec. 2361 (1988)).

relatively easy at some point to give a profile of a person . . . I think that is wrong."[30] Senator Leahy's commentary was prescient—it anticipated the rise of targeted online advertising based on consumer profiles compiled from big data—and it also illustrates how the VPPA was designed to accommodate emerging technologies. To that end, the Act covers the disclosure of both physical videotapes and "similar audio visual materials."[31] "Congress used [the phrase] 'similar audio video materials' to ensure that VPAA's protections would retain their force even as technologies evolve."[32] In the words of Senator Al Franken the VPPA is a "powerful privacy law" that "gives you the right to tell your video company what can be shared and what cannot."[33]

The VPPA prohibits a "video tape service provider" from knowingly disclosing a consumer's "personally identifiable information" to a third party without that consumer's express written consent.[34] A "video tape service provider" includes "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[.]"[35] "Personally identifiable information" under the VPPA "includes information that identifies a person as having requested or obtained specific video materials or services from a video tape service provider."[36] To avoid liability

---

[30] S. Rep. No. 100-599, at 5–6.

[31] 18 U.S.C. § 2710(a)(4).

[32] *In re Hulu Priv. Litig.*, No. 11-CV-03764 (LB), 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012) (finding Hulu as an online video streaming service is a "video tape service provider" under the VPPA).

[33] *The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Hearing Before the Subcomm. on Privacy, Tech. & the Law of the S. Comm. on the Judiciary*, 112th Cong. 3 (2012); *see also Amazon.com LLC v. Lay*, 758 F. Supp. 2d 1154, 1171 (W.D. Wash. 2010) (granting summary judgment in favor of Amazon and refusing to allow the North Carolina Department of Revenue to obtain the identities and records regarding Amazon customers' video or audiovisual purchases in the state because disclosure would violate the VPPA).

[34] 18 U.S.C. § 2710(b). Congress amended the VPPA in 2012 by revising a provision allowing video tape service providers to disclose personal identifying information to third parties with informed, written consent. *See Ellis*, 803 F.3d at 1253 (citing 158 Cong. Rec. H6849-01 (Dec. 18, 2012)). The scope of the VPPA was not altered by the amendment. *Id.*

[35] 18 U.S.C. § 2710(a)(4).

[36] 18 U.S.C. § 2710(a)(3).

under the Act, a consumer must give "informed, written consent" to the disclosure that is "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer."[37] An aggrieved consumer may sue to recover damages of at least $2,500 for each VPPA violation, punitive damages, attorneys' fees and costs, and equitable relief.[38]

HBO violated the VPPA when it transmitted Claimant's video watching history and identity to Meta and other third parties. HBO is a "video tape service provider" under the VPPA because it makes money by selling on-demand access to prerecorded videos online throughout the U.S.; it is therefore "engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."[39] Courts have consistently held that online video streaming platforms like HBO Max fall within that definition.[40] Claimant is a "consumer" covered by the VPPA because Claimant made an HBO Max subscription profile and used that profile to access the HBO Max video library; Claimant is therefore a "subscriber of goods or services" from HBO.[41] The information HBO transmitted about Claimant, including but not limited to Claimant's Facebook User ID, is "personally identifiable information" under the VPPA because it allowed the third-party recipients of that information to identify Claimant personally as having watched specific videos on HBO Max. Claimant did not give informed consent to that transmission through a separate and distinct, written consent form.

---

[37] 18 U.S.C. § 2710(b)(2)(B)(i).

[38] 18 U.S.C. § 2710(c)(2).

[39] 18 U.S.C. § 2710(a)(4).

[40] *See, e.g., Stark v. Patreon, Inc.*, No. 22-CV-03131-JCS, 2022 WL 7652166, at *6 (N.D. Cal. Oct. 13, 2022) (collecting cases and stating that, "Courts have generally construed 'similar audio visual materials' [under the VPPA] broadly, finding that streaming video delivered electronically falls within that definition."); *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *6.

[41] 18 U.S.C. § 2710(a)(1). HBO repeatedly refers to its users as "subscribers" in its Terms of Use.

## Conclusion

Claimant therefore brings this action for statutory damages of $2,500 per VPPA violation, , punitive damages, attorneys' fees, costs, and an injunction preventing HBO from sharing Claimant's identity and video watching history with third parties without Claimant's affirmative, express written consent.[42]

Respectfully Submitted,

_____
Garth R. Segroves, BPR 023358
113 West Moore Street
Tullahoma, Tennessee 37388
Telephone:    (931) 393-4366
Facsimile:    (931) 259-4466
Email: garth_segroves@att.net


Please Serve Defendant at:
WarnerMedia Direct, LLC
C T CORPORATION SYSTEM
300 MONTVUE RD
KNOXVILLE, TN 37919-5546 USA

---

[42] Claimant reserves the right to amend the amount in controversy following discovery.